Good morning. Good morning. Charles Carion, appearing for Plaintiff of Poland, American Buddha. Mr. Carion, before we get started, can I just ask you a practical question? Certainly. Why wasn't this case settled? There was no progress in negotiations. What did you want them to do? You've agreed that they're not looking for damages. They've apparently agreed they're never going to pull the motive again, at least from what we understand of the record. You don't have an as-applied issue for that reason. You just want to try to make some kind of an important case out of this, some kind of a ruling that will help in your specialty to open up new vistas of litigation? Your inquiry is a fair one, Your Honor. I was greatly influenced in my law school career 25 years ago, and I was asked to write an encyclopedia entry on licensing of the press, and I was very impressed by particularly the Jehovah's Witnesses cases, which I thought had made a very important point. In this case, there was a tender settlement from the plaintiff for basically a cost of litigation with no fees, and I think that amounted to maybe $500 or $1,000, and that was rejected by the city. At that point, it certainly seemed worth going forward. Depositions had been taken. I don't think you have to go to elaborate lengths to explain why you haven't settled. The question that we need to now address is, now that you are here, is it correct or not that the city has agreed that they would not pull the modem connection should this event transpire in the future? I don't think there's been any legal concession of that sort at all. The district court found, as I understand it, there was no policy or practice other than, in this case, there was the singular act of an employee who shut down the entire modem, shut down the entire access to American Buddha's site based on a claim of an infringing item. What is it that you want us to decide that's contrary to that? Well, first of all, there were disputed issues of fact with regards to the conclusion. There was evidence in the record that Mr. Holbo had been disconnecting modems for years based upon a policy that he had articulated, and he finally reduced to writing after this disconnection. So I think it was an erroneous finding to conclude that, in fact, this was a singular act. It was not. Okay, so wait. I'm sorry. Go ahead. The concern that I have has to do with whether this case is moot since you're not seeking damages. And in order for it to be capable of repetition yet evading review, it's clear that the time, the hour or so, was a little bit short to get a case into court. But even as you have articulated the policy to pull the plug, so to speak, for alleged infringing materials, how can we say that it's likely that your client will again be in a position where they are posting something that's alleged to be infringing, in other words, that meets all of the criteria for the policy of the city that you've just described? Why is that likely? Well, because, as was established in the record, American Buddha actually operates the American Buddha Online Library. And it operates pursuant to the asserted copyright liability exemption of 17 U.S.C. 108. It has received copyright infringement notices in the past that have not gone directly to the city of Ashland, but have been handled otherwise. Is your understanding that the city's practice will be that if anyone complains to them about an alleged infringing item on American Buddha's website, they will once again shut down the entire website as a result? My understanding is that their contention is that they can do so. And so what we have here is a situation where the city giveth and the city taketh away. The city has created the Ashland Fiber Network. It has created an organ of communication. It has created under the Arizona Life Coalition, for part test, a vehicle for private speech. And it has exercised absolute authority to place a single functionary in control of that right. If he had seized the presses of the Ashland Daily Tidings, it would be no less momentous from a constitutional point of view. But there is no obligation on the part of the city to provide this, is there? They don't have to provide an internet access to anybody. Based on city duty, is it? I understand that they decided that. I'm asking you, was there a constitutional obligation on the part of the city to provide internet access of this nature to its citizens? No, certainly not. Okay, so that being the case, why would a city in its right mind continue to provide such access if it feels like every time somebody makes a mistake or makes an intentional decision at a lower level of the government, they're going to be dragged before the Ninth Circuit with all the costs involved? Why wouldn't they just pull a plug and say, you know what, this is just way more than we thought we wanted to do for the service. But this is just beyond the pale. They certainly have the option to do that, Your Honor. They haven't done so, possibly because there is a very substantial internet industry in Ashland There are seven internet service providers. There are thousands of websites that are hosted from the city. It provides a considerable amount of revenue. And those internet service providers, one of those was actually the one that was in privity of contract with American Buddha, right? Not the city. That is certainly true. However, that is of no constitutional moment, Your Honor. What is your First Amendment theory, then? What they have done. Certainly. Under the Arizona Life Coalition case decided last year by this court, the four-part test is satisfied to determine that the Ashland Fibernet is a public forum. The purpose of the program was to foment public speech and use of the internet by the public. Editorial control vests in the hands of the website authors. The identity of the literal speakers are the website authors and the responsibility for the content. For example, liability for copyright infringement under 17 U.S.C. 502 Sub A vests with the website authors. Why isn't this more like the provision of an electricity line to the public library? The electricity line isn't the public forum. The library would be the public forum. I'm not sure why the fiber network is any different than that. Because the electricity does not have any communicative content. What about the American Library Association case? Why is this a public forum? This is a public forum because it fits the description provided by the Arizona Life Coalition case, which followed the Bredesen decision. The Supreme Court in the American Library case talked about the fact that the internet has not existed from time immemorial. It's not the place where people have gone from the beginning of time to air their grievances. This is a courtesy. It's a service provided, but it's not a wide open public forum like Pioneer Square, for example. Oh, but it is, Your Honor. It is entirely wide open. And what authority do you cite for that? That would be Reno v. ACLU. And you think that's what that stands for? I think that it's very clear that the internet is subject to no lesser First Amendment protection than any other form of speech. Than a public square? Than a public square. Once it's particularly a public square, it is on exactly the same level when you are allowing to publish speech. Probably a good reason that most cities don't. And in the American Library case, how do you distinguish that one? The American Library case involves a small number of computers inside a library space. And there was limited access. And the court was trying to, excuse me. Why was it limited? It was limited because you just have a few computers. You don't have 150 miles of fiber optic cable extending into every home in town. So it's the quantity of cables and computers connected to it? No, it is the fact that there is no necessity, no necessity whatsoever for the city to exercise editorial control. And that would come back around to the Arizona Life Coalition case. No authority to exercise editorial control. Then you have to apply the strict scrutiny standard. You have to show that your regulation is necessary to serve a compelling state interest. Why is the action taken by this employee, which was remedied an hour later apparently, why is that not subject to harmless error analysis? And there would be no such thing in a free speech case? There is virtually no such thing as a de minimis First Amendment violation. If you locked up the printer for one hour or you locked up the door to the newsroom for one hour, the chilling effect would be as, I don't want to be hyperbolic, but I do think that the chilling effect is. Don't you think you're being a little hyperbolic on that? Well, then I'll stop there. I'll stop there. However, I do think that the chilling effect is such that if you can stop someone once from publishing, then you can stop them again. If you can stop one person and you have a secret policy that basically, to me, it is no different than the Jehovah's Witnesses cases. And in those cases, you always find that a new technology gives rise to questions exactly as you're on or asking. And I thank you for the opportunity to answer them. And I simply look at it as a new technology which presents new questions. And what happens is that technicians who are in specialized positions of control naturally become the focus point for decision-making. So the fact that this man didn't know anything about copyright law, maybe he should have, but somebody calls and says, you know, this is violating the copyright. So he takes it off for an hour and then finds out that's not the case. He wasn't trying to, in a traditional speech situation, wasn't trying to filter it. He was responding to what he thought was an illegal act on the part of American Buddha. Isn't that correct? I don't believe so, Your Honor. I believe that what you have there is a policy that vested excessive discretion in a single policymaker with no opportunity. That's not the question you were asked. You were asked whether... I don't think that was factually correct. I think that that was a disputed issue of fact. I think that the sequence of events showed that he created his own copyright violation by cutting and pasting a copyright notice from the Washington Post, actually attributed a copyright complaint to the Washington Post, a complete invention on his part in order to... He's not the defendant here. I beg your pardon? He's not the defendant here. That's why I'm trying to understand. The defendant is the city. Now, wait a minute. The city, you are challenging, as I understood from the opening of this argument, a practice which you say shuts down protected speech, and yet what you're now reverting to is that it's vested unlimited discretion in a single individual who can and is... That is in fact... But I understood the policy to be that you put forward in his writing was that if certain things happen, he has no discretion. His discretion is to shut down the modem. So are you attacking him as an applied case, or are you attacking the city policy as stated? The policy literally is not the focus. Well, then why are... The policy as written might stand up to some kind of scrutiny. The problem is that it basically makes him the chief of police who has the right to say... Excuse. I thought that you had no as applied challenge here. I beg your pardon? Do you have an as applied challenge or not? Yes, Your Honor. Okay. As applied and facial. I think that it's both facially unconstitutional and it was applied unconstitutionally by... There is at least an issue of fact as to whether there was unconstitutional animus that was directed toward this speaker based upon the assertion of a third party that there was obscene content here. And that appears to have been the motivation for hijacking the discretion that was vested in him, which was erroneously vested in him, because this policy had been in existence a long time. I liken it to the Oviatt case, I think, fairly. You're way over your time. I think we'll hear from the city. Thank you, Your Honor. Thank you. May it please the court, Karen O'Casey on behalf of the city of Ashland. A couple of points I want to make. The Reno decision does not answer the question presented by this case. Reno had to do with a criminal statute having to do with people accessing what was on the Internet, not what was posted by the website. So it doesn't solve the problem at all. A couple of things factually. First of all, at the trial court level, it was factually undisputed that the reason that Mr. Holbow pulled the modem was because, number one, he got a copyright violation claim. He did not make a determination that there was a copyright violation. Plaintiff asserts that, and that's not supported by the record. And number two, he contacted a gentleman named Mr. Dowd, who works for infrastructure, who is the Internet service provider that actually had the agreement with American Buddha, and Mr. Dowd said he's on a disconnect list. And so it got disconnected. That fact was absolutely undisputed. Plaintiffs spent a great deal of time, both at the trial court briefing and in this briefing, asserting that there had to have been some retaliatory motive. Okay. But let's set that aside. Because the employee is not the defendant here. The city's policy is. So is there a city policy or is there not? There was not a city policy. So what is it that this individual was operating pursuant to? Here's what he testified to. In the past, if he had gotten a claim of copyright infringement, he had followed a few steps that sort of, sort of reflected an Internet service policy under the Digital Millennium Copyright Act. All right? It was not written down. He had done it a few times. When this case came along, he actually sat down and wrote it out. And it doesn't comply strictly with what the Digital Millennium Copyright Act says an Internet service provider needs to do. So if I have a website and somebody comes along, I'm using the city-provided modem, and I have a website that has a panoply of links and information and content, and somebody comes along and says, one of the items on your website is infringing my copyright, then this employee has the right to shut down my entire website. Yes, potentially, because that's. That's the city's official policy. Well, it wasn't an official policy. It's what Mr. Holbow did in those situations. Well, is it a policy or is it not? Is it a practice or is it not? At the time of this incident, it was something that Mr. Holbow had done in the past. The issue is whether or not the city's liable. Now, does the city have a practice and a policy that it has endorsed or that it has ratified? No. Then what is this employee doing? How does he have the authority to shut down an entire website because somebody makes an allegation of copyright because his policy is sort of in compliance with the Digital Millennium Copyright Act? Because he's the individual that works at AFN who gets the contact from either the internet service provider or the person claiming a copyright violation. Well, that may be. So what you're saying is that if I take advantage of the city modem and I put up a website and somebody, this fellow, doesn't happen to like some item that's on my website, he can shut down my entire website at his whim. Can he walk in and pull the modem anytime he wants? Yes. So can the internet service provider. Well, the internet service provider isn't the party that's at issue here. The party at issue is the city. Correct. And the city has created an opportunity for its people to access the internet and it is now saying that if you put up a website on the city-provided service, the city, because it doesn't like the content of something on the website, can pull the plug. The city hasn't said that at all. Well, it did. It shut his website down. It shut down the entire American Buddha website because of one allegedly offending item.  That is not what the record says. But did it do that? We're making a distinction between an offending item and a copyright violation. Mr. Holboe testified very clearly. He did not call Mr. Dowd at the internet infrastructure to talk about this website because he didn't like the content. Whether he liked it or not, whatever he did, he told them to shut it down. He pulled the modem, right? People could not access the American Buddha website. That is correct, but he did not do that because of its content. Well, of course it was. It was an alleged copyright infringement. That is content-based. Well, it's not content-based for purposes of a First Amendment analysis. Why not? No, because it's content-based to the extent that it is based on the Digital Millennium Copyright Act. The statute does not override the First Amendment. The statute sets forth a procedure whereby you can narrowly tailor, if you will, how you would treat a copyright infringement. But that's not what this case is about. This case says that an employee in the city can shut down an entire website because the employee believes, in the purest of motives, that the allegation that an item, one item on the website, can shut down the entirety of the website. I disagree with that characterization of the Digital Millennium Copyright Act actions. It has nothing to do with. I'm talking about the First Amendment. Well, and this case presents, to the extent it presents at all, an intersection between if the city decides to enforce the digital. Assume the city becomes an Internet service provider. The Digital Millennium Copyright Act is aimed at, the portion that we're dealing with is aimed at one thing, providing insulation from liability from individuals who have a copyright violation. They haven't complied with the Digital Millennium Copyright Act, as far as we know. Well, let's go back to the hypothetical. The city is the Internet service provider. Let's go back to this case. Counsel, I just want to understand the city's position. The city's defended this case in the district court that there was no policy or practice. Now you're telling me there is a policy or practice. It's based on what this fellow wrote down, and that he has the authority, and it's apparently ongoing authority, if he decides, as the technician in charge of complaints about or operation of the modem, if somebody comes to him and says, focus strictly on copyright infringement, that some item on a broad website, one item out of a thousand items they've got, is allegedly infringing a copyright, that he has the discretion, he has the authority to pull the modem and knock everything off the airwaves until that offending alleged item is removed. Is that the policy? Is that the policy? The city did not adopt that as a policy, no. Did Mr. Feldo do that? Yes. Is there evidence in the record that that may be what the city believes it is operating under? The evidence in the record is that Mr. Holbow did this. There's no evidence in the record that the city, the city council, the city, and when I say council, I mean the council or someone in charge ordered him to do that. Did he do it? Yes, he did. According to a custom and practice that he followed over time? According to his own understanding of the Digital Millennium Copyright Act that in the past he had done. That really gets to a point that concerns me. The city says there was no policy and yet here's this guy who is not a lawyer and yet he purports to be complying with the Digital Millennium Copyright Act. Who advised him with respect to the Digital Millennium Copyright Act? Does the record say? No, no, and he testified. He himself did not make a decision about whether there was a violation. Why were you talking before then about the fact that this was in compliance with the Digital Millennium Copyright Act? He thought he was complying, right? He thought he was. How did he even know that there was one unless he consulted with someone? There's no evidence of that in the record at all. Did he say anything about the Digital Millennium Copyright Act? What he testified to is that he said he knew that, I mean, that there are certain steps that you have to follow. In the Digital Millennium Copyright Act? In the Digital Millennium Copyright Act. One of the disputes was whether those steps were followed or not, but there certainly, and that's all he testified to. There was no evidence in the record at all about whether he consulted with someone, whether these steps should. To understand, this is very important in the sense that if the city has a policy, then you have a bit of a problem. He said there is no policy. There's this rogue guy out there, there's no policy. The plaintiffs have said there is a policy, it's a longstanding policy, and now we understand that this guy was trying to comply with the Digital Millennium Copyright Act. This is not a random act. He obviously had some understanding, some knowledge, and where did he get it? Does the record indicate? It does not, Your Honor. It does not. So are we left to speculate then that the city did have a policy because the guy tried to comply with the Digital Millennium Copyright Act? Well, the question becomes is he a high enough individual in the hierarchy to have the one single act be a policy? Well, I guess the question is how long has this policy been in effect if it is a policy? Well, he could not testify as to when he first started doing that. How old is the network itself where the city is provided? I don't remember when it was established. Is it five years, ten years? Something like that. No, it's relatively new. It was relatively new at the time. Five years then, approximately? Approximately. Okay, and is there anything in the record that indicates how many times modems have been pulled? No, this was the first. I can tell you this was the first case that this issue was ever raised. So to the best of the city's knowledge, according to the record, this is the first time that a modem has been pulled. Is that correct? No, it was the first time that there had ever been an issue. I believe Mr. Hobo testified. Has there been a lawsuit? Correct. Okay. A claim, something like that. Mr. Hobo, I believe, testified that he had in the past on a few occasions had this come up, called the ISP, and he believed that a modem had been shut down based on a copyright infringement claim. Does the record say how many times that occurred? No. Let me ask you a question that has to do with mootness, a similar question that I asked opposing counsel. Is there evidence from which one could conclude that this particular plaintiff is likely to get crosswise with the city again concerning an alleged copyright infringement? No. There's no evidence in the record at all about that. And I'm not sure that one can infer from the past practice. That can't be inferred from the record. You just said there were several instances in which the city had shut down the modem. Not having to do with this particular modem. I'm sorry. This is the only one who sued. This is the only issue that was ever raised. As I understand the mootness doctrine, it has to be this particular plaintiff for whom it is capable of repetition. And plaintiff's counsel has said that they at least have received periodic complaints of copyright infringement. From that, would it be fair to infer that the next one of those might go to the city rather than to them and that this could happen all over again? I mean, there's absolutely no evidence in the record about that likely or being likely or not likely at all. I mean, there's not been any issues since this lawsuit was originally filed with respect to this plaintiff or anyone else. Do you agree with the plaintiff's characterization that there is no agreement of any kind going forward that this will not happen again based upon a copyright infringement allegation? I believe that what this is. I can answer the question. It's outside the record. Is that okay? I'm interested in that. Yeah. I believe that because of one of the issues being in this case, that Mr. Holbo didn't follow the statutory requirements of the Digital Loan Copyright Act precisely, that the city did sit down and write out and adopt a Digital Millennium Copyright Act policy. So that would be a matter of public record, presumably, if the city actually did that. I believe that that happened, yes. Other than that, nothing else has changed in the way that it, you know, sells its- There's no agreement with the plaintiff's. He's accurately characterized the fact that there is no agreement with respect between American Buddha and the city. No, that is correct. There's no special agreement. Have you all ever tried to get together and work something out on a going-forward basis? Out of compliance with that, whatever. It understands legally the Digital Millennium Copyright Act requires or permits it. And what the particular litigant is. I understand they have tried to take their steps under the MCA. Is there any basis for all of you to get together and figure out what makes sense? What has some employees shutting down an entire website because somebody makes an allegation of copyright infringement? Well, like I said, so far the response, to my understanding, is the adoption of a written policy under the Digital Millennium Copyright Act. Has there been any effort to get together in mediation to make help in this case? No, there has not been any effort to do that. And part of it is this case- I mean, I'm way past my time and I apologize, but- Don't apologize. We're asking the questions. In this case, irrespective of all of the legal issues having to do with the claim, raised an issue for the city. The city installed this fiber optic network. That's because Internet service, obviously, is something that it wanted to provide to its citizens. So it lays down- it goes to the trouble of creating the structure, just like a telephone company. Because it needs to provide telephone service. If the city shuts off the telephone, my telephone, because they don't like what's on my telephone or what I'm getting over my telephone, then there's a problem. And that's what I'm trying to understand. And so then what they do is they don't want to be in the Internet service provider business. They don't want to do that. They just have the structure. So then they enter into these contracts. And so the very first question raised by this case is, well, if we're operating, as you raised, if we're operating a public forum, then maybe we don't want to do this. Maybe not. And so that's- My question- I don't want to prolong the argument. My question was only, we have a mediation unit in this court. It would be of interest to the parties to see if you can get together and analyze what is obviously a cutting-edge problem here. If you think that would be productive, that service is available. If you think that would be a useful step or not. We tried that at the previous, the Ninth Circuit's mediation program. There was actually a discussion, and it was not productive. Okay, that answers the question. I'd like to just ask one thing. Would you, and this may be a matter of public record that we could access, would you provide in the 28-J letter the internet site for the city so that we can, assuming it's on a website, that we can access it and determine what the current Digital Millennial Copyright Act compliance is? If it's on- Yes. Yeah, it should be on there. If it is as you- Sure. Yes. Thank you, counsel. Everybody's gone well over their time, but you may have two minutes for rebuttal if you want them. You may have two minutes for rebuttal. The effect of the shutoff is, as I believe the Court understands, to exercise control by a state entity over communication that was sponsored through the city system. And the district court looked at the Oviatt-Monel test and came to the wrong conclusion. It concluded that there was no policy when, in fact, there was a policy. And this is a policy that was very similar to the Oviatt case in which the policy was an error of omission. And in this case, again, I think it was an error of omission to not construct a policy that was sufficiently specific and to not train the person who was responsible for implementing that policy to implement it in a constitutionally appropriate manner. It is possible to have a constitutionally appropriate manner of dealing with copyright infringement. But in this case, you can see the infirmity of the policy in the way it was carried out and it was susceptible to misuse by Mr. Hobo. Do you believe the constitutional issue was sufficiently clear that this mid-level tech employee should have understood it? The gravity of the rights that are going to be affected, I think, elevates the obligation of the city to make sure that person, in fact, does. So, in effect, you're arguing for a heightened scrutiny in this situation? I'm arguing for what the Supreme Court would require, which is a policy that is narrowly tailored to serve a necessity. I respect what you're saying. This is a very important issue. I respect your advocacy on this. I'm just trying to understand. It seems to me you are asking us to hand down a ruling that will, in effect, clarify and indeed create specific law dealing with this relatively narrow issue. I'm puzzled how you can ask us to do that and yet, at the same time, say that this mid-level tech employee should have understood what the law is. He should not have had the job of determining that, Your Honor. Okay. So, then we get back to the issue that Judge Fischer raised in the first place. Which was? Thank you, Counsel. Thank you, Your Honor. I appreciate very much the arguments of both of you. Yes, very interesting. The case just argued is submitted. We'll hear the next two cases, which are related to one another, and then we'll take a break after that, just so you can plan your time. We'll next hear Bova v. The City of Portland.
judges: Graber, Fisher, Smith